

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13  CV  8814

------------------------------------------------------------ X

GARRY EMBRY,

                Plaintiff,

      -against-

BEST BUY CO., INC., MONICA HUBBARD,
KARL SANFT, STEVE DELP, and RYAN
MUNTHE, in their individual and professional
capacities,

                Defendants.

------------------------------------------------------------ X

No.

**COMPLAINT**



Garry Embry ("Plaintiff" or "Mr. Embry") by and through his attorneys, Thompson

Wigdor LLP, as and for his Complaint against Best Buy Co., Inc. ("Best Buy" or the

"Company"), Monica Hubbard ("Ms. Hubbard"), Karl Sanft ("Mr. Sanft"), Steve Delp ("Mr.

Delp"), and Ryan Munthe ("Mr. Munthe") (collectively, "Defendants") hereby alleges as

follows:

## NATURE OF ACTION

1.     On March 4, 2013, Defendants terminated Mr. Embry from his position as a

Director/District Manager at Best Buy in retaliation for his filing of an Occupational Safety and

Health Administration (OSHA) complaint under the whistleblower provisions of the Sarbanes-

Oxley Act (SOX).  Mr. Embry had suffered previous retaliation by Defendants in the terms and

conditions of his employment because he internally reported the misappropriation of Company

funds by other employees which he believed constituted fraud and other unlawful conduct in

violation of federal laws including, but not limited to, those prohibiting mail fraud, wire fraud

and fraud against shareholders.

2.      Specifically, Mr. Embry had complained anonymously in July 2011 about the unlawful and fraudulent conduct of his supervisor, Monica Hubbard.  Mr. Embry communicated in a letter to the Company's senior executives as well as to Company investigators regarding Ms. Hubbard's apparent misappropriation and diversion of large amounts of Company funds for her inner circle.  Mr. Embry observed various types of diversion and misappropriation, including, but not limited to, over-budgeting money for certain District Managers, approving improper relocation reimbursements, and throwing lavish parties under highly specious business pretexts. An internal investigation prompted by Mr. Embry's complaint placed several high-level executives under heightened scrutiny, such as Senior Vice President of U.S. Retail Karl Sanft. The Company then took the step of demoting Ms. Hubbard, who left the Company shortly thereafter.

3.      Some months later, as soon as Mr. Embry revealed that he lodged the anonymous complaint regarding Ms. Hubbard to his superiors, Best Buy management commenced a series of blatantly retaliatory acts which necessitated the filing of Mr. Embry's OSHA complaint, and which ultimately culminated in his unlawful termination.

4.      These actions by Best Buy and its management are both symptomatic of and abetted by an organizational culture that disregards the Company's obligation to encourage employees to report potential legal violations without fear.  Indeed, the Company's Code of Ethics and purported "Zero Tolerance Policy on Retaliation" offers the following warning to potential whistleblowers: "Remember, however, ethics are a two-way street.  Any allegations made maliciously or in bad faith may also lead to disciplinary action up to and including termination."  As this thinly veiled threat of retaliation against would-be whistleblowers demonstrates, the Company, as a matter of policy, discourages employees from reporting fraud

and/or unlawful misconduct by threatening consequences for employees whose complaints are somehow deemed "malicious" by the Company.

5.     The Company's Code of Ethics therefore would have a chilling effect on even those potential whistleblowers who have witnessed egregious and unlawful conduct. The Company's Code cautions employees to "exercise [their] own best judgment" in lodging complaints outside of the Company's proscribed channels. To that end, the Company warns employees against "using anything – including statements, photos, audio, video or other resources – that could be perceived as harassing or bullying in tone, may be considered malicious, obscene, threatening or intimidating to someone, or could potentially defame one of Best Buy's many stakeholders. This could include submitting an offensive report with the intent of harming someone's reputation . . . ."

6.     Unsurprisingly, this tolerance of unethical and unlawful conduct permeates the Company's highest levels. Indeed, in May of 2012, Richard Schulze, the founder of Best Buy, resigned from his position as Chairman of the Board of Directors after failing to alert the Board about an inappropriate relationship in which Brian Dunn, the Company's then-CEO, was engaged with a female subordinate. Industry observers noted that the Company's culture of secrecy and lack of transparency allowed the unethical behavior of its top executives to continue for too long and exacerbated its harmful effects. See, e.g., http://www.businessinsider.com/best-buys-pr-crisis-turned-into-a-bloodletting-2012-5.

7.     By Best Buy's very own standards, the activity reported by Mr. Embry directly violates the Company's responsibilities to its shareholders. Indeed, in the "Responsibility to Our Shareholders" (emphasis added) section of its Code of Ethics, the Company lists "Appropriately manage and safeguard Company assets," "Maintain complete and accurate financial records,"

3

and "Assure the integrity of all Company books, records and accounting practices" as essential to the Company's obligation of "Maintaining Financial Integrity." In spite of his efforts to protect the Company and its shareholders, Mr. Embry was harassed, bullied, punished and ultimately terminated for his trouble, sending a clear warning to other would-be whistleblowers.

8.     Mr. Embry accordingly brings this action to recover damages arising from Defendants' unlawful termination of his employment in retaliation for his protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act").

## JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

9.     Jurisdiction is conferred on this Court by 18 U.S.C § 1514A and 28 U.S.C. § 1331.

10.     Venue is appropriate in this District under 28 U.S.C. § 1391(a) as a substantial portion of the course of events surrounding the allegations took place in New York, New York.

11.     On October 31, 2012 Plaintiff timely filed a Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the "whistleblower" provisions of the Sarbanes-Oxley Act (hereinafter, the "Administrative Complaint").

12.     By letter dated November 13, 2013, OSHA issued its letter providing Plaintiff with an administrative dismissal and withdrawal of the Administrative Complaint.

13.     OSHA did not issue a final decision on Plaintiff's Administrative Complaint within 180 days of the Administrative Complaint's filing. Accordingly, pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to seek *de novo* review of his Complaint from this Court.

14.     On or around October 15, 2013, Plaintiff in writing informed OSHA, the U.S. Department of Labor and the Office of the Chief Administrative Law Judge of the U.S.

Department of Labor that Plaintiff intended to seek *de novo* review in federal court rather than continue to seek relief through OSHA's procedural mechanisms.

## PARTIES

15.    Mr. Embry worked as a District Manager/Director for Best Buy from in or around August, 2005 until his termination on or around March 4, 2013.   He is a citizen of the United States and at all relevant times met the definition of a Best Buy "employee" and/or "eligible employee" under all applicable statutes.

16.    Best Buy Corp., Inc. is a Minnesota limited liability company with a principal place of business in the United States at 7601 Penn Avenue S., Richfield, Minnesota 55423. Defendant Best Buy conducts business and maintains operations and facilities in New York City, and its shares are listed on the New York Stock Exchange.  At all relevant times, Defendant Best Buy met the definition of "employer" and/or a "covered employer" under all relevant statutes, and maintains approximately 167,000 employees in 4,100 stores in the United States and around the world.  Best Buy is one of the world's largest electronic retailers.  As a publicly held corporation which is listed on the New York Stock Exchange, Best Buy issues multiple classes of securities required to be registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

17.    Ms. Hubbard is a citizen of the United States and was employed by Best Buy at all relevant times as Regional Vice President/Territory General Manager.

18.    Mr. Sanft is a citizen of the United States and was employed by Best Buy at all relevant times as Senior President of North American Sales.

19.    Mr. Delp is a citizen of the United States and was employed by Best Buy at all relevant times as Territory General Manager/Vice President.

20.    Mr. Munthe is a citizen of the United States and was employed by Best Buy at all relevant times as Territory Director for the Home Business Group.

## FACTUAL BACKGROUND

### MR. EMBRY'S EMPLOYMENT AND PROTECTED COMPLAINTS

21.    Mr. Embry worked as a District Manager/Director, overseeing all operations for parts of the Northeast Region (the "Region") for Best Buy from August, 2005 until his unlawful and retaliatory termination on March 4, 2013.

22.    At all relevant times, Mr. Embry's performance for the Company was outstanding, and he was essential in establishing Best Buy's footprint in Manhattan.  Mr. Embry was recognized as one of the Company's top achievers among its District Managers and Directors in 2009.

23.    Ms. Hubbard was promoted to the Officer-level position of Regional Manager in or around late 2008 or early 2009.  From that point until around August or September 2011, Ms. Hubbard supervised Mr. Embry.

24.    In January, 2010, Mr. Embry was asked to manage a specially created district comprised of Best Buy's bottom 10% of stores nationwide due to Ms. Hubbard and Best Buy's management's recognition of his ability to turn around failing districts.  Mr. Embry began managing this district in March, 2010 and received a base salary raise of $25,000 to do so.  Ms. Hubbard communicated to Mr. Embry that this was a long-term turnaround project, as these stores had been failing for 10-12 years, and promised him that he would receive the substantial resources necessary to be successful in this endeavor.

25.     Within a few months of her rising to the Regional Manager position, Mr. Embry observed Ms. Hubbard consolidating her control over her part of the organization by promoting and advancing the careers of her friends and by exercising unprecedented unilateral control over the Region's budget process.  Under Ms. Hubbard's new, opaque practices, District Managers/Directors like Mr. Embry were only given budget figures once they were set and were no longer privy to how the budgets were calculated and composed.

26.     Mr. Embry observed several District Managers/Directors within Ms. Hubbard's inner circle living far beyond their means, and suspected that some individuals may have been benefiting from improper reimbursements or other fraudulent practices which could be carried out relatively easily by people at the District Manager/Director level or higher.

27.     Mr. Embry noted these improper expenses such as, by way of example only, relocation expenses granted to favored personnel under circumstances which generally would be prohibited by the Company (multiple relocations, relocations that were unnecessary, etc.).  Ms. Hubbard also allocated several District Managers higher-than-necessary operating budgets.

28.     Moreover, by way of further example, in or around the winter of 2010, Ms. Hubbard used a thinly veiled business justification to throw a lavish three-day "retreat" in the Poconos, where she rented chalets for attendees, but conducted only one hour of business meetings for the duration of the trip.  While there, Mr. Embry observed his coworkers binge drinking and disappearing together into bedrooms rather than engaging in productive business activities.

29.     Mr. Embry discussed with his peers at the Company, including three Senior Directors, the possibility of collecting expense reports, which would reveal improper charges and reimbursements by Ms. Hubbard for her favored staff.  However, none of them would go on

record as making such a request or recommendation to the Company for fear of the retaliation that all believed would likely result.

30.     Mr. Embry's numerous discussions with other District Managers and Directors about Ms. Hubbard's conduct apparently alerted Ms. Hubbard and her inner circle that it was Mr. Embry and his close associates who were questioning her actions, and she quickly became increasingly hostile towards Mr. Embry and those close to him.

31.     At a meeting attended by Mr. Embry in or around the spring of 2011 in Phoenix, Arizona, Ms. Hubbard announced to a group of managers that "there's a traitor on the team," "someone's been talking," and she was "going to find out who it is, and when I do they're going to be gone." Ms. Hubbard also stated that "The HR Director is a piece of shit, is asking questions, and can't be trusted." These statements made Ms. Hubbard's retaliatory animus towards anyone who questioned or challenged her actions very clear.

32.     Mr. Embry had several conversations with Ms. Hubbard about the inappropriate expenditures, asking Ms. Hubbard about her closed meetings and the justification for various large expenses.

33.     Mr. Embry was met with hostility from Ms. Hubbard on these occasions, and she often told Mr. Embry to "fuck [him]self" or made similar profane brush-off comments. With no other recourse, and because he reasonably believed that Ms. Hubbard was engaged in misappropriation of Company funds, which by necessity involved mail and wire fraud, as well as possible violations of federal securities laws (all of which affected the Company's finances and its shareholders), Mr. Embry resolved to inform Best Buy's senior executives of Ms. Hubbard's conduct.

34.     On or around July 25, 2011, Mr. Embry mailed an anonymous letter to Best Buy's Board of Directors, Chief Executive Officer (CEO) and two former Company CEOs.  Mr. Embry's anonymous letter states that he believed Ms. Hubbard's conduct was "inappropriate, unprofessional, <u>unethical</u>, and <u>continuously put[] the company at tremendous risk</u>," and that "if not stopped, [it would] have tremendous financial costs (both human and financial) and <u>put the company at legal risk</u>," (emphasis added) and that an investigation should be conducted.  The letter also expressly states that the author "cannot risk the retaliation that would happen from the TGM [Ms. Hubbard]," and that "Others feel this way but are too afraid of retaliation from her to speak up."

35.     Mr. Embry was compelled to write his letter anonymously due to the near-certainty that openly coming forward would result in swift and serious retaliation against him.  Mr. Embry also was unable to report Ms. Hubbard's conduct by calling the Company's ethics hotline because such complaints would merely be redirected to Ms. Hubbard herself or to Karl Sanft, who was Ms. Hubbard's direct supervisor and would have alerted Ms. Hubbard to the complaint.

36.     Mr. Embry met with an internal investigator in connection with a Company investigation launched in or around August or September 2011, a few weeks after he sent his letter to senior management.

37.     In his investigatory interview, which lasted around three hours or more, Mr. Embry recommended that a comprehensive review of Ms. Hubbard's expense and budget reports and other financial expenditures be conducted to reveal improper charges and other infractions.  Mr. Embry provided various documents to the investigators as well.

38.     In this meeting, Mr. Embry was told that the investigation had been prompted by a "well-written" letter that was sent to the Board of Directors concerning Ms. Hubbard. In or around August or September, 2011, following this investigation, Mr. Embry and his fellow District Managers and Directors were told that Ms. Hubbard had decided to take another job with the Company (a District Manager-level position).

39.     Upon information and belief, Ms. Hubbard was required to take a lower position with the Company, yet her salary was unaffected by the job change. Ms. Hubbard eventually left the Company for another job.

40.     In or around December, 2011, Mr. Munthe assumed duties as the interim Territory Regional Manager, Ms. Hubbard's former position. In or around April, 2012, Mr. Delp was named to the Territory General Manager/Vice President role previously occupied by Ms. Hubbard and Mr. Munthe.

41.     Upon information and belief, Mr. Delp, sometime after assuming the position, engaged in an extramarital affair with Patricia Nouri, a District Manager and one of the primary beneficiaries of Ms. Hubbard's financial improprieties.

### DEFENDANTS' UNLAWFUL RETALIATION AGAINST MR. EMBRY

42.     As soon as Ms. Hubbard suspected Mr. Embry of reporting her unlawful conduct, and continuing after the demotion of Ms. Hubbard with Mr. Munthe, Mr. Embry was subjected to a retaliatory campaign in which his budgets were scrutinized and greatly limited, depriving him of essential resources, such as equipment and fixtures for stores within his district and requests to hire external talent.

43.     After Mr. Delp took over for Mr. Munthe, Mr. Embry hoped to alert Mr. Delp of the retaliation to which he had been subjected in order to regain access to the resources necessary to perform his job and optimize his District's results.

44.     On or around May 2, 2012, Mr. Delp visited several of Mr. Embry's stores and the two of them held an in-person meeting.  At that time, Mr. Embry told Mr. Delp that he had written the anonymous letter about Ms. Hubbard to the Board of Directors and CEO.  Mr. Delp claimed that he had not been briefed on Ms. Hubbard's misconduct or the resulting investigation.

45.     Two days later, on or around May 4, 2012, Mr. Embry received a performance review from Mr. Delp, during which he received a 2.8 "Values" performance rating, a subjective component of the performance reviews which accounts for the difficulty of employees' assignments.  This was his lowest such rating at the Company to date and caused Mr. Embry to receive an overall rating of "below expectations" by a small margin, which exposed him to summary discipline.  Mr. Embry typically had received "Values" ratings of around 4.0, an "exceeds expectations" rating, or higher.

46.     District Managers/Directors at Best Buy generally receive reviews in person or through a web conference on which the basis for the review and substantive feedback can be seen.  But Mr. Delp, who took the highly unusual step of giving the review over the phone, bizarrely and vehemently refused to show Mr. Embry a copy of the review or any information supporting the negative ratings, which supposedly were based upon a failure to hit certain performance targets or budget numbers.  The supposed failure of Mr. Embry to meet his numbers could only be attributed to the fact that Mr. Embry had been assigned two years before to a special district comprised of Best Buy's bottom 10% of stores nationwide in an effort to turn them around over time.

47.   Mr. Delp claimed that he was not responsible for the review (he had assumed his duties only days or weeks before), but rather that he was "just administering it."  Mr. Munthe, who had temporarily assumed Ms. Hubbard's duties at the behest of Mr. Sanft, appeared to be responsible for the performance ratings in Mr. Embry's May 4, 2012 review.

48.   Mr. Sanft also would have approved Mr. Embry's performance review, would have been aware of the results of the investigation and Mr. Embry's cooperation with it, and would have been responsible for personnel decisions regarding Ms. Hubbard (e.g., keeping her at the Company at the same pay rate rather than terminating her following the investigation).  The investigation into Ms. Hubbard's activities placed Mr. Sanft under substantial scrutiny. Furthermore, both Mr. Delp and Mr. Munthe were close personal friends and direct reports of Mr. Sanft.

49.   Only two days passed between Mr. Embry's revelation to Mr. Delp that he had sent the anonymous letter recommending an investigation of Ms. Hubbard and this review, tying these two events closely together.  This timing, combined with the complete lack of factual justification for the negative performance review and Mr. Delp's bizarre refusal to provide a performance evaluation document despite Mr. Embry's repeated requests, strongly demonstrates the retaliatory purpose of the review.

50.   On May 9, 2012, Mr. Embry reported to Michael Doyle, the Senior Director of Employee Relations, that he had been retaliated against through the negative performance review and his treatment by Mr. Delp.

51.   Later, on or around May 31, 2012, after Mr. Embry continued to insist that he be given a copy of his review, he was sent an incomplete Pay and Performance Statement by Mr. Delp.  This document, which was missing several pages on which the substance of the evaluation

would normally appear, states that "you will not be receiving an increase in pay at this time." Mr. Embry declined to sign this review and the Company refused to provide him with a complete copy of it despite several requests to Mr. Delp and others. Mr. Delp eventually claimed that he did not have the rest of the pages that would normally be included in the review.

52.     Mr. Embry also learned on May 31, 2012 that, as a result of this review, his entitlement to restricted Company stock shares would be lost.

53.     In or around July, 2012, Mr. Embry told Mr. Delp that he had retained counsel in connection with his employment at Best Buy. Mr. Delp referred Mr. Embry to Kris Rosen, a Vice President of Human Resources.

54.     On or around July 31, 2012, Mr. Rosen openly discussed with Mr. Embry the fact that Mr. Embry had written the anonymous letter regarding Ms. Hubbard, asserted that the negative performance review could be explained, and claimed that the notes from the Company's investigation regarding Ms. Hubbard were somehow "sealed."

55.     On or around August 14, 2012, Mr. Embry was told by Human Resources to talk with Sue Neimi, one of the Company's investigators, who promised to call him the next day regarding his concerns. Mr. Embry received no follow-up communications from Ms. Neimi.

56.     On or around September 27, 2012, Mr. Embry was told to interview with a third Company investigator, who told him that the Company had resolved its investigation regarding Ms. Hubbard. The investigator then, incredibly, told Mr. Embry that she instead wanted to address his purported performance issues.

57.     Defendants' unlawful retaliation against Mr. Embry continued when, during the week of October 15, 2012, Mr. Delp, along with a Human Resources representative, met with Mr. Embry and informed him that, because of his supposed performance problems and since he

"could not let the past go," he had three options regarding his employment with Best Buy: 1) he could accept a demotion; 2) he could resign his employment at the Company; or 3) he could remain in his District Manager/Director position and be placed on final warning status in the 30 days following a special performance review (the final step before termination). In this meeting, Mr. Delp stated that, "We're not firing you yet." Amazingly, Mr. Delp went so far as to recommend that Mr. Embry, an employee who had alerted the Company to issues that were sufficiently serious to result in the demotion of a senior official, consider entering counseling. The Human Resources representative who was present at the meeting stated that she had taken notes of what was said. This ultimatum was given without warning or prior notice, and had no performance-based justification. Mr. Delp's statement regarding Mr. Embry's unfortunate focus on "the past" is a near-express reference to the Company's displeasure regarding Mr. Embry's protected whistleblowing and management's retaliatory motives.

58.    Defendants continued to apply Mr. Embry to a different standard of performance and different terms and conditions of employment than those applied to his peers.

59.    On or around December 11, 2012, Mr. Embry was required to attend a meeting in Westbury, Long Island with Defendant Delp and a Company Human Resources representative, during which his purported performance deficiencies were briefly discussed.

60.    Later that week, on or around December 14, 2012, Mr. Embry had a follow-up conference call with Defendant Delp and a Company Human Resources representative, during which he was told that his performance would be closely monitored throughout the month of December. In fact, Defendant Delp told Mr. Embry that, if his performance did not improve in December, he would be given a "final warning" in January before the Company ultimately terminated his employment. Even though Mr. Embry's performance was in line with many of

his peers, his peers were not subject to such scrutiny, nor threatened with either a final warning or termination.

61.   Moreover, during the December 14, 2012 conference call, Defendant Delp informed Mr. Embry that moving forward he would call Mr. Embry every Friday to discuss Mr. Embry's performance.  Although many of Mr. Embry's peers were not hitting their target numbers (in fact, Mr. Embry's performance was better than that of several of his peers), no one else was required to have weekly conference calls with Defendant Delp and Human Resources to review his or her performance.  Accordingly, these weekly scheduled performance calls were retaliatory and constitute disparate treatment in response to and because of Mr. Embry's protected reports of Defendants' unlawful, fraudulent conduct.

62.   On or around December 21, 2012, Mr. Embry had his first weekly performance conference call with Defendant Delp and a Human Resources representative of Best Buy. During this call, Defendant Delp unfairly criticized Mr. Embry's performance.  For example, Defendant Delp criticized Mr. Embry for not engaging and learning from his local peers, and said that Mr. Embry's reluctance to do so demonstrates his "inability to put things behind him and go forward."

63.   Upon information and belief, Defendant Delp was fully aware that Mr. Embry's three local peers were all participants in the conduct on the part of Ms. Hubbard and her associates that Mr. Embry originally reported to the Company's senior management as fraudulent, and therefore their relationship with Mr. Embry was severely strained.  Defendant Delp offered no assistance in facilitating such meetings or a rapprochement between Mr. Embry and his local peers.

64.     Defendants continued to single out Mr. Embry, undermine him in front of his team and level various criticisms at him, many of which were and are based upon false or inaccurate information or representations.

65.     This blatantly retaliatory conduct continued during a meeting on or around January 18, 2013 that Mr. Embry was required to attend in Norwalk, Connecticut with a Human Resources representative.  Defendant Delp participated in this meeting by telephone.  At this meeting, Defendant Delp continued his efforts to harass Mr. Embry and force him out of the Company.  As with the previous recent meetings held with Mr. Embry purportedly due to his performance, the criticisms leveled at Mr. Embry in this meeting were inaccurate and substantially based upon double standards, as well as a clear misreading of Company results, and were even fabricated.

66.     By way of example only, Defendant Delp criticized Mr. Embry concerning his purported lack of response to the quarterly Performance and Development Guide ("PDG") comments regarding Mr. Embry's performance.  Mr. Delp claimed this was indicative of Mr. Embry's "lack of engagement."  Mr. Embry explained to Defendant Delp that he had never received his PDG report, revealing the criticism as transparently false and retaliatory.  However, Defendant Delp was adamant that he sent it to Mr. Embry and insisted that Mr. Embry had ignored it.

67.     After the meeting, Mr. Embry asked Defendant Delp to send him a copy of the PDG.  When Mr. Embry received the email from Defendant Delp attaching the PDG, other emails appearing in the chain showed that Defendant Delp had originally sent the document only to himself, and not to Mr. Embry.  This blatant fabrication lays bare Defendants' determination

to force Mr. Embry out of and undermine his position at the Company upon any pretext, no matter how easily discoverable.

68.     Additionally, Defendant Delp falsely claimed that Mr. Embry had missed or canceled multiple meetings, including one with territory staff partner David Ring.  Defendant Delp's accusations were flatly false and again reflect Defendants' true aim: to make Mr. Embry look incompetent and manufacture a pretext for his termination.

69.     Then, during the January 18, 2013 meeting, Defendant Delp told Mr. Embry that his employment would be terminated if a dramatic financial improvement in Mr. Embry's area of responsibility did not appear on Best Buy's financial and business results reports to be issued in the following three or four weeks.

70.     Upon information and belief, Mr. Embry's peers who had been performing at a similar level to Mr. Embry were not threatened with termination.  Furthermore, this threat of termination came during a period in which the Company's results were lackluster across the board.

71.     The Company also cannily tied Mr. Embry's future employment with Best Buy to results for a period of time that had already passed, therefore depriving him of any opportunity to improve his performance or the results.  Accordingly, Defendants' threats of termination were transparently retaliatory and designed to harass and attempt to force Mr. Embry out of the Company, or otherwise provide Best Buy with a pretext to terminate his employment.

72.     On or around February 27, 2013, Best Buy announced that the Company was going to undergo a restructuring, which would involve the supposed elimination of certain unspecified positions.  On or around March 4, 2013, Mr. Embry was notified that he needed to drive out to Westbury, New York on Long Island for a face-to-face meeting with Mr. Delp and Catie

Connealy of the Company's Human Resources department. Management had scheduled phone calls, and not meetings, with Mr. Embry's peers who were terminated and/or assessed out of their positions earlier that day.

73. The Company canceled a conference call that had been scheduled with Mr. Embry and instead required him to travel some distance to his minutes-long termination meeting. The Company therefore indisputably subjected Mr. Embry to disparate treatment in the manner of his termination.

74. Best Buy terminated Mr. Embry's employment at the March 4, 2013 meeting in retaliation for filing this action and engaging in other protected activity under federal law.

75. The Company and Defendants used a wider set of terminations in an attempt to camouflage their retaliation against Mr. Embry.

76. Indeed, no fewer than three former colleagues have since independently approached Mr. Embry to express their belief that they were selected for termination due to their cooperation with the investigation of Ms. Hubbard and their connection to Mr. Embry.

77. In further blatant retaliation for filing his OSHA complaint, and despite Mr. Embry's years of hard work and dedicated service to the Company, Best Buy did not offer him a single dollar in severance pay, a further example of treatment different from that of his colleagues.

78. The Company's complete disregard for Mr. Embry's ability to transition to a new job without serious financial disruption and risk to his family contrasts greatly with the treatment of Mr. Embry's peers who were terminated and/or assessed out of their positions in connection with this purported reduction-in-force or reorganization.

79.     About three other District Managers in Mr. Embry's territory also purportedly had

their positions eliminated, but these comparators of Mr. Embry were given 30 days to find

another job within the Company and the option of accepting a valuable severance package of

around nine months' salary and vacation pay, either before or after looking for a new job within

the Company.

80.     Moreover, in a further effort to humiliate and retaliate against Mr. Embry,

Defendants notified Mr. Embry's peers of his termination before he had even left the building in

Westbury and/or had an opportunity to talk with them himself.

81.     Upon information and belief, this public approach to announcing an employee's

termination was not used with respect to Mr. Embry's peers and comparators.

82.     Additionally, Mr. Embry's team was notified of his termination during a

conference call later that evening, in which Defendant Delp simply stated that Mr. Embry was

"no longer employed," implying that Mr. Embry had done something wrong.  Indeed, many of

Mr. Embry's team members were astonished by the perfunctory and cold way that the Company

handled his termination, as well as the fact that Mr. Embry was not offered any severance.

83.     Even after terminating his employment, Best Buy continued to retaliate against Mr.

Embry.  Specifically, Best Buy failed for months to remove Mr. Embry's number from the alarm

service call list for each of his former stores (the purpose of which was to alert managers to

possible break-ins and disturbances).

84.     Mr. Embry lodged seven separate requests with Catie Connealy, explaining that,

with each call alarm he received, he was forced to relive the humiliation of his termination.

Moreover, these calls often occurred in the late hours of the night and very early hours of the

morning.  Mr. Embry received at least 21 documented calls since his termination over six months ago.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Sarbanes-Oxley Act Violation)

85.    Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

86.    As set forth above, Defendants violated the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, by taking adverse employment actions against Mr. Embry, including, but not limited to, termination in retaliation for Mr. Embry's lawful and protected conduct in providing information, causing information to be provided regarding, or otherwise assisting in investigations of Ms. Hubbard's misappropriations of Company funds, which constituted violation of various federal laws, including mail fraud and wire fraud, and its legal obligations to its shareholders.

87.    As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer severe financial, mental and emotional hardship and injury, including the loss of compensation, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorneys' fees, costs and disbursements.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that an award be issued in his favor containing the following relief:

A.    Reinstatement;

B.    Back pay, raises, bonuses, deferred compensation, benefits, reinstatement of seniority and tenure, and other orders necessary to make Plaintiff whole;

C.     An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Sarbanes-Oxley Act;

D.     An order expunging Plaintiff's termination and ordering Defendants to remove any records of termination against Plaintiff;

E.     An order prohibiting Defendants from disclosing any disparaging information about Plaintiff to prospective employees, or otherwise interfering with any applications he might make in the future;

F.     Compensatory monetary damages in an amount determined to be fair and equitable compensation for Plaintiff's emotional distress and loss of reputation;

G.     Pre-judgment interest on all amounts due;

H.     An award of costs and expenses, as well as reasonable attorneys' fees, incurred by Plaintiff in this action to the fullest extent permitted by law; and

I.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  New York, New York
December 12, 2013

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____

Douglas H. Wigdor
Lawrence M. Pearson

85 Fifth Avenue
New York, NY  10003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845
dwigdor@thompsonwigdor.com
lpearson@thompsonwigdor.com

*COUNSEL FOR PLAINTIFF*